IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
DETROIT DIVISION

| | | |
|---|---|---|
| MAXWELL LORINCZ, JASON POE, EARL CANTRELL CARRUTHERS, and BRANDON SHOBE, individually and on behalf of a class of all others similarly situated, | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | C.A. No. 2:16-cv-12290 |
| COL. KRISTE KIBBEY ETUE, in her official capacity as the Director of the Michigan State Police and INSPECTOR SCOTT MARIER, in his official capacity as the Interim Director of the Michigan State Police Forensic Science Division, CAPT. JOE QUISENBERRY, in his official capacity as Commanding Officer of the Forensic Services Laboratory for Oakland County, and MICHAEL BOUCHARD, in his official capacity as Sheriff of Oakland County, Michigan, | § § § § § § § § § § § § | CLASS ACTION SUIT JURY DEMAND |
| Defendants. | ) § § § | |

**CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

Maxwell Lorincz ("Maxwell"), Jason Poe ("Poe"), Earl Cantrell Carruthers ("Carruthers"), and Brandon Shobe ("Shobe") (collectively, "Plaintiffs"), individually and on behalf of a class of all others similarly situated, bring this Class Action Complaint against Colonel Kriste Kibbey Etue, in her official capacity as the Director of the Michigan State Police, Inspector Scott Marier, in his official capacity as the Interim Director of the

1

Michigan State Police Forensic Science Division (the "State Defendants"), Captain Joe Quisenberry, in his official capacity as commanding officer of the Forensic Services Laboratory, and Michael Bouchard, in his official capacity as Sheriff of Oakland County, (the "County Defendants") (State Defendants and County Defendants, collectively "Defendants"), and allege as follows:

## I.  NATURE OF ACTION

1.      This is a civil action under 42 U.S.C §§ 1983 and 1988 seeking declaratory and injunctive relief.  Specifically, Plaintiffs bring this action because of the serious risk of deprivation of Plaintiffs' liberty interests, rights under the Fourth Amendment of the Constitution, and right to substantive and procedural due process.  These deprivations result from the Michigan State Police Forensic Science Division (the "Forensic Division") intentionally misrepresenting test results regarding marijuana, at the behest of the Prosecuting Attorneys Association of Michigan ("PAAM") and other law enforcement agencies, to support the charging of felonies when none occurred. In fact, the State Defendants instituted an official policy, which is still in place, that ignores the basic tenets of forensic science and leads to the systematic reporting of inaccurate test results supporting felony charges.  This Constitutional violation is ongoing and affects not only Plaintiffs but thousands of other similarly situated Michigan citizens, in particular the approximate 180,000 registered medical marijuana patients in Michigan.

2.      A marijuana plant contains dozens of cannabinoids which are chemicals found almost exclusively in the cannabis plant.  The most well known cannabinoid is Delta-9-Tetrahydrocannabinol, which is generally referred to as THC, and is the substance

2

primarily responsible for the psychoactive effects of marijuana. However, many cannabinoids have little or no psychoactive effect yet are present even when the marijuana plant is converted to an oil or an edible.

3. Under the Michigan Controlled Substances Act ("MCSA") all plant-based cannabinoids and any oils, edibles, or other non-regulated substances containing them are controlled as "Marihuana," and the possession of these substances has for decades been a Schedule 1 misdemeanor.[1] Further, the thousands of Michigan citizens who have a medical marijuana license have a right to possess a defined amount of marijuana, which includes plant-based cannabinoids. However, under the MCSA, possession of synthetic, laboratory-manufactured THC is a Schedule 1 felony.[2] THC does not become "synthetic," and thus subject to felony prosecution for possession, simply because it is extracted from the marijuana plant and converted into an oil or baked into an edible form. The MCSA and courts interpreting it make this clear.

4. Emails obtained through a Freedom of Information Act ("FOIA") request reveal that PAAM acted in concert with the Forensic Division to establish a formal policy to report plant-based cannabinoid oils and other edibles as, at least potentially, Schedule 1 synthetic THC. The policy established by the Forensic Division creates forensic reports contrary to the facts, the forensic science, and the law. At least one reason for the policy

---

[1] The MCSA uses and defines the term "Marihuana," which is often spelled "marijuana" in general usage. For purposes of this Complaint, either spelling refers to the cannabis plant as defined in the MCSA.

[2] To be clear, Plaintiffs do not complain about what is commonly referred to as synthetic marijuana where a chemical variation of a naturally occurring cannabinoid is manufactured and often mixed with plant materials such as herbs. Plaintiffs' complaint relates to the reporting of THC which has the same chemical composition whether synthetic or naturally occurring in a marijuana plant.

change was to better establish probable cause to arrest medical marijuana patients, obtain forfeiture of their assets, charge them with crimes they did not commit, and to allow felony charges against others for what is at most a misdemeanor.

5. Similarly, the Forensic Science Laboratory for Oakland County (the "County Lab"), the only other public forensic lab in Michigan, under the direction of the County Defendants, have reported and continue to report test results regarding marijuana in a similar manner by reporting marijuana derived oils and edibles as Schedule 1 THC (without any qualification), which allows for the charging of crimes and/or felonies where none occurred.

6. The false reports provided by the Forensic Division and County Lab result in wrongful arrests, detentions, and forfeitures. The reports also enable prosecutors to charge, or threaten to charge, non-existent felonies so as to coerce pleas or falsely convict citizens of a crime unsupported, and indeed contradicted, by the forensic evidence. Approximately 90% of convictions in Michigan are the result of plea deals.

7. Further, the policy appears to be directed in large part at participants in the Michigan Medical Marijuana Program ("MMMP"). As the Massachusetts Supreme Court stated when faced with a crime lab scandal of this magnitude, "This particularly insidious form of misconduct, which belies reconstruction, is a lapse of systemic magnitude in the criminal justice system" and "the [criminally charged] defendant is entitled to a conclusive presumption that egregious government misconduct occurred in the defendant's case." *Commonwealth v. Scott*, 467 Mass. 336, 352 (2014).

## II.  JURISDICTION AND VENUE

8.      This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1331 as this action arises under the Constitution and laws of the United States.  This District is an appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in this District, and 28 U.S.C. § 1391(b)(1) since at least one Defendant resides in this District, and all Defendants are residents of Michigan.

## III.  PARTIES

9.      **Plaintiffs**.

(a)      Maxwell is an individual who resides in Ottawa County, Michigan.  Maxwell is a licensed medical marijuana patient;

(b)      Poe is an individual who resides in Livingston County, Michigan.  Poe is a licensed medical marijuana patient; and

(c)      Shobe is an individual who resides in Oakland County, Michigan.  Shobe is a licensed medical marijuana caregiver.

(d)      Carruthers is an individual who resides in Oakland County, Michigan.  Carruthers is a licensed medical marijuana patient, and also is a licensed caregiver.

10.      **Defendant Colonel Kriste Kibbey Etue**.  The Forensic Division has multiple laboratories, and provides forensic services to all Michigan counties except Oakland County.  Col. Etue is the Director of the Michigan State Police and has supervisory authority over the Forensic Division. She may be served at her principal place of business,

5

Michigan State Police Headquarters, 333 S. Grand Avenue, Lansing, Michigan 48909. She is sued in her official capacity.

11.    **Defendant Inspector Scott Marier**. Inspector Marier is the Interim Director of the Forensic Division, and is therefore directly responsible for the unconstitutional and illegal reporting practices described herein. He may be served with process at his principal place of business, 7320 N. Canal Road, Lansing, Michigan 48913. He is sued in his official capacity.

12.    **Defendant Captain Joe Quisenberry**. Capt. Joe Quisenberry is the commanding officer of the Forensic Services Division of the Oakland County Sheriff's Department which includes the County Lab.  He may be served with process at his principal place of business, 1200 N. Telegraph Road, Pontiac, Michigan 48341.  He is sued in his official capacity.

13.    **Defendant Sheriff Michael Bouchard**.  Sheriff Bouchard is the Sheriff of Oakland County who has ultimate authority over the County Lab.  He may be served with process at his principal of business at 1200 N. Telegraph Road, Pontiac, Michigan 48341. He is sued in his official capacity.

## IV.  FACTS

**A.    FACTS RELATING TO PLAINTIFF MAXWELL**

### 1.    Background

14.    Maxwell lives with his wife Erica and their 6-year-old son in Spring Lake, Michigan.  Maxwell suffers from chronic pain associated with two herniated disks and

severe celiac disease.  He has been prescribed numerous opioid painkillers that, while alleviating the pain, adversely affected his physical and psychological health.

15.     In 2009, a doctor recommended to Maxwell that medical marijuana might alleviate some of his pain without causing other adverse effects.  Max made application for and received his patient card, and is therefore a registered participant in the MMMP. Maxwell, who does not smoke, chose to ingest the medical marijuana in the form of oil extracted from the plant.  The treatment worked well and Maxwell's pain faded as did the side effects from the opioids.

16.     Erica suffers from bipolar disorder.  On September 24, 2014, she suffered a manic episode.  It is possible she also ingested one of Maxwell's prescription medications. Maxwell called 911 for assistance, and Erica was taken to the emergency room to receive treatment.  A deputy arrived along with the paramedics and confiscated a "black/brown tar-ish residue" that appeared to him to be a residue of hash oil extracted from the marijuana plant.  Maxwell presented his marijuana patient documentation.  The deputy removed the sample and sent it for testing at the Forensic Division lab in Grand Rapids.

### 2.     Maxwell's Criminal Charge

17.     The county prosecutor subsequently charged Maxwell with possession of marijuana.  Maxwell refused to plead guilty to this misdemeanor, asserting his immunity under the MMMP.  Based on the Forensic Division lab report discussed below, the prosecutor threatened to charge Maxwell with possession of synthetic THC, a felony under Michigan law, if he continued to refuse to plead guilty to misdemeanor marijuana. Maxwell refused to plead.

18.     Maxwell was then charged with and bound-over for trial on the felony charge of purportedly possessing synthetic THC, a Schedule 1 controlled substance under the MCSA. The charge was based on a Forensic Division lab report purporting to analyze the oil residue allegedly found in Maxwell's possession.

19.     The Forensic Division declared the sample in Maxwell's case to be "Delta-9-Tetrahydrocannabinol Schedule 1 (Origin unknown)." *See* Exhibit A. Under the MCSA, THC is listed in Schedule 1 only as a synthetic, and marijuana (which contains THC among numerous other chemicals) is listed separately.  However, the Forensic Division's scientist testified in connection with Maxwell's criminal proceeding that he was "not able to tell which pathway (plant or synthetic) led to the THC (he) identified."  *See* Exhibit B, p. 52.

20.     In Maxwell's case, the State not only wrongfully charged him with a felony, it also took away his child and placed the 6-year-old with a Christian adoption agency.

21.     The felony case against Maxwell was ultimately dismissed because there was no evidence he possessed synthetic THC, although he is still subject to being charged with possession of marijuana. However, that does not end the concerns raised by the Defendants' conduct. Maxwell and the approximately 200,000 other participants in the MMMP face the prospect of being wrongfully detained, searched, and prosecuted as a result of the Forensic Division's official reporting policy regarding marijuana. Indeed, the rights of numerous other Michigan citizens are endangered by this policy of reporting false felonies.

**3.     The Criminal Charge Against Maxwell was Based
on an Intentionally Faulty Lab Report**

22. Only possession of synthetic THC is categorized and punishable as a Schedule 1 felony under the MCSA. *See* MCL § 333.7212(1)(d) and (e). Plant-based THC is not, and the possession of it is a misdemeanor subject to greatly reduced penalties. *People v. Campbell*, 72 Mich. App. 411, 412 (1976) ("natural THC to be punished only under the provisions dealing with marijuana"); *People v. Carruthers*, 301 Mich. App. 590, 597; 837, N.W.2d 16 (2013) ("Possession of THC extracted from marijuana is possession of marijuana" under the MCSA, citing *Campbell*). Of course, Maxwell is and was a registered patient entitled to possess marijuana.

23. The Forensic Division's own lab results clearly indicated that the substance at issue in Maxwell's case was plant-based. The results of the gas chromatography test showed the presence of several other naturally occurring cannabinoids, and likely more existed but were not tested for by the Forensic Lab. Therefore, the most reliable scientific conclusion was that the sample was plant-based and not synthetic, particularly when there was no countervailing indication that the THC was synthetic. *See* Exhibit C, Expert Report of Dr. Land.

24. The probability that the substance contained synthetic THC was, in layman's terms, astronomical for several reasons. First, there is no reason anyone would go through the arduous process of synthesizing THC for personal use when it is readily available from marijuana. Second, the lab report implicitly assumes that not only the THC but the other cannabinoids found were synthetic, and there is absolutely no reason to synthesize cannabinoids which have no psychoactive effect on a user. Third, the lab report also implicitly assumes that a person would go through the above processes knowing that

9

possession of synthetic THC was punishable as a felony, while possession of THC derived from marijuana is still marijuana, and therefore punishable only as a misdemeanor, or for a medical marijuana patient not punishable at all.  Finally, the Forensic Division's test results did not provide any countervailing indication that the THC was synthetic as opposed to derived from marihuana.

25.     The Forensic Division's scientist essentially admitted this in his testimony at the *Daubert* hearing in Maxwell's criminal case.  Even if a sample contained 25 different cannabinoids naturally occurring in marijuana, the Forensic Division's scientist speculated that maybe someone could have synthesized all 25 cannabinoids and put them into the sample.  Exhibit B, p. 78-79, 81-82.  However, the only reasonable and forensically valid conclusion was that the sample almost certainly contained plant-based marijuana. The Forensic Division's report was based on pure speculation about what might have happened rather than on a scientific approach which takes into account the actual test results obtained.

26.     It is clear that this speculation was an attempt to circumvent Michigan law, as the Court of Appeals addressed this precise issue in *People v. Campbell*:

> THC is most commonly found in its natural state, being the active ingredient in marijuana, but it can also be produced synthetically…. In the present case, it was uncontroverted that the substance sold by the defendant contained natural THC.  Based on this fact, the defendant contended, both at trial and originally in this appeal, that he should have stood trial for sale of marijuana, a four-year felony, rather than the charged offense. He pointed to the language of the Controlled Substances Act… and argued that *the Act intended to include the sale of only synthetic THC in the category of narcotics carrying a seven-year penalty, while it intended sale of natural THC to be punished only under the provisions dealing with marijuana.*  On appeal the prosecution has agreed that the defendant's interpretation of the relevant provisions of the Controlled Substances Act is the correct interpretation of those provisions. This Court agrees. The language of the Act supports this

10

conclusion. *Unless the statute is so interpreted, any person selling marijuana could be charged with sale of THC and become subject to the greater penalty since all marijuana contains at least a trace of natural THC. In enacting the Controlled Substances Act, the Legislature did not intend such an anomalous result.*

*Campbell*, supra at 870-71 (emphasis added).

27.     Despite the clear distinction between plant-based and synthetic THC under Michigan law, the Forensic Division reported, and its scientist testified in Maxwell's case, that (a) the sample tested positive for Schedule 1 THC, *i.e.*, it was synthetic because otherwise it would be classified as marijuana under Michigan law, and (b) the origin was unknown. Both of these statements cannot be true. In fact, both are false.  If the sample tested positive for Schedule 1 THC, then its synthetic origin is known. If its origin is unknown, it cannot have tested positive for Schedule 1 synthetic THC.

28.     Although the Forensic Division claims there is no scientific test that can determine if a sample is plant-based, this is contrary to established forensic science.  In fact, the substance that formed the basis of the charge against Maxwell did not test positive for synthetic THC and its almost certain plant origin was knowable and known.  Based on the Forensic Division's own test results, several other naturally occurring cannabinoids besides THC were detected in the sample, thus leading to the forensically accurate determination that the sample was almost certainly marijuana.  *See* Exhibit C.

29.     The Forensic Division should have reported "Schedule 1 marijuana" based on its own lab results.  In fact, the Forensic Division reports plant-based THC as marijuana in its reports when, as discussed below, its arbitrary criterion of visible plant matter is met.

**B.     FACTS RELATING TO PLAINTIFF POE**

11

30.    Poe was arrested and charged with possession of marijuana on the basis of a lab report generated by the Forensic Division's Northville Facility that identified one substance as marijuana and another substance as "other," with additional information stating that the presence of Schedule 1 THC was detected but not confirmed.  As in the case with Maxwell, the lab report supports the conclusion that the THC was synthetic since it was not reported as marijuana.

31.    Although charges against Mr. Poe were dropped, he faces the threat of re-filed charges based on the inaccurate forensic report, which failed to even test for the presence of cannabinoids other than THC in the substance identified as "other."

**C.    FACTS RELATING TO PLAINTIFF SHOBE**

32.    Shobe was arrested and charged on the basis of a Forensic Division lab report that identified a substance alleged to be in Shobe's possession as "Delta-1-Tetrahydrocannabinol Schedule 1," with additional information stating that "the origin of the Delta-1-Tetrahydrocannabinol may be from a plant (marijuana) or a synthetic source." Again, the Forensic Division knows, and has the capability to determine, that the substance was almost certainly plant-based and therefore should have identified it as marijuana.

33.    Shobe has been charged with possession of marijuana, but faces the possibility of a felony charge for possession of synthetic THC based on the inaccurate lab report.

**D.    FACTS RELATING TO PLAINTIFF CARRUTHERS**

34.    Following a traffic stop on January 27, 2011, Carruthers was charged with possession with intent to deliver marijuana and driving with a suspended license.  At the

time of the traffic stop, Carruthers had a medical marijuana card for himself, caregiver applications for four patients, and a caregiver certificate. Carruthers had various edibles that contained marijuana for medical use in his vehicle.

35. The edibles were sent to the County Lab which identified the edibles as Schedule 1 THC, with no qualification, meaning the THC was synthetic. Carruthers was convicted of possession of marijuana with intent to deliver and was sentenced to three years probation with 33 days in jail, a sentence he served pending appeal.

36. On appeal, the Appellate Court vacated Carruthers' conviction and remanded the case back to the trial court where Carruthers faces retrial for charges, including potentially a felony charge for possession of synthetic THC, based on an inaccurate lab report generated by the County Lab.

37. Based on information on its website, the County Lab has capabilities at least equal to the Forensic Division. The County Lab has the capability to determine the presence of other naturally occurring cannabinoids when testing samples, and therefore the capability to determine whether THC is in all likelihood plant-based rather than synthetic. Nevertheless, the County Lab in its reports identifies all THC which does not contain visible plant material as "Schedule 1 THC." This intentional misrepresentation leads to the filing of felony charges where none was committed, the ability to manufacture probable cause for search warrants, potential detention, and wrongful plea deals.

**E. THE LAB REPORTS IN THE STATE PLAINTIFFS' CASES WERE THE RESULT OF A CONSCIOUS POLICY DECISION**

13

38.     Internal Forensic Division documents recently obtained by a FOIA request show a concerted action by Forensic Division leadership, PAAM, and law enforcement to ignore the law and bend the science so as to report all marijuana oils and solids that do not contain visible plant matter as potentially Schedule 1 synthetic THC regardless of (a) what the tests showed regarding the number or type of other naturally occurring cannabinoids in the sample and (b) whether there was any countervailing evidence supporting that the THC was synthetic.  In fact, the Forensic Division actually changed its lab manual to require this result from its scientists. This change was made in an attempt to strip medical marijuana patients of their rights and immunities, charge or threaten to charge citizens with greater crimes than they might have committed, obtain plea deals, and increase proceeds from drug forfeiture.

39.     As recently as 2013, PAAM pressured the Forensic Division to uniformly report medical marijuana edibles and oils as Schedule 1 THC when plant material was not visible.  However, the Forensic Division had long known, as one of its scientists wrote, that "it is highly doubtful that any of these Med. Mar. products we are seeing have THC that was synthesized. This would be completely impractical. We are most likely seeing naturally occurring THC extracted from the plant!" *See* Exhibit D, Email, Penabaker to Chirackle, May 30, 2013.

40.     A Forensic Division scientist also noted that "in order to place the actual compound THC in Schedule 1, the criteria of 'synthetic equivalent' should be met…. (W)e can't do this…. Also, by going out on that limb and calling it THC, you now jump from a misdemeanor to a felony charge." *Id.*  In other words, the Forensic Division knew that to

report a marijuana sample as Schedule 1 THC was without support and was scientifically unsound.

41. Some Forensic Division scientists also voiced concern over the lab's "responsibility to determine whether the THC found is natural or synthetic" and the fact that "the charge changes to a felony with the identification of THC." *See* Exhibit E, Email, Hoskins, December 13, 2013.

42. These concerns were responded to by Ken Stecker, the traffic safety officer for PAAM: "That is my opinion, THC is a Schedule 1 drug regardless of where it comes from. I hope that helps. Ken." *Id.* The Forensic Division then issued a directive requiring its scientists to report marijuana oils and solids as synthetic THC "when no visible plant material was found" noting that the MCSA "has been clarified by Ken Stecker." *Id.* The lab then set out to change the procedure manual of guidelines for identifying marijuana to require that all forensic scientists report THC Schedule 1 for all "oils, food products and other substances" where plant material could not be visualized. *See* Exhibit F, Email, Hoskins, February 11, 2014.

43. Nevertheless, Bradley Choate, the Controlled Substance Unit Supervisor at the Lansing Laboratory of the Forensic Division strongly objected to the change. Noting that "the Controlled Substances Procedure Manual specifically states that Marijuana is a special case" and that oils and solids extracted from the Marijuana plant are controlled as Marijuana by statute. He then correctly laid out the science and the law: "When THC is identified in a case, the analyst has two choices: (a) identify it as Marijuana which for possession is a Schedule 1 misdemeanor, and (b) identify it as a synthetic equivalent which

15

for possession is a Schedule 1 felony. There is not a third choice. The question then becomes is the THC from a natural source, *i.e.*, Marijuana or a synthetic source. *The presence of other cannabinoids indicates that the substance is from a natural source.*"  *See* Exhibit F, Email, Choate to Hoskins, February 14, 2014.

44.     Mr. Choate went on: "Prosecutors rely on our reports to determine what to charge a person with. A report that states Delta-1 THC without any other statement would lead a prosecutor to the synthetic portion of the law…. This could lead to the wrong charge of possession of synthetic THC and the ultimate wrongful conviction of an individual. For the laboratory to contribute to this possible miscarriage of justice would be a huge black eye for the division and the department…. We don't leave it up to the prosecutor to figure this out." *Id*.

45.     Despite concerns raised by some of the forensic scientists, other forensic scientists were more than willing to bend the science to suit the alleged needs of prosecutors.   For example, emails show that prosecutors were concerned that if oils and edibles were identified as marijuana instead of Delta-1 THC, they would not have probable cause to obtain search warrants and/or arrest medical marijuana patients.   The forensic scientists knew that "prosecutors are willing to argue that one speck of marijuana does not turn the larger quantity of oil/wax into marijuana."  *See* Exhibit G, January 27, 2015 email from Pierson to other forensic scientists.  As noted above, however, the Forensic Division was well aware that plant-based THC was treated as marijuana under the MCSA.

**F.      THE CRIME LAB PERVERTED SCIENCE AND BROKE THE LAW BY MISREPRESENTING ITS FINDINGS**

16

46.     Some Forensic Division scientists tried to incorporate actual science into their analysis, proposing that "the identification of at least three cannabinoids one of which shall be THC" was a sufficient profile to determine a sample to be plant-based. *See* Exhibit F, Email, Choate, February 14, 2014.  However, the Forensic Division threw all science out the window; it changed its Laboratory Guidelines section 2.1 to *require* analysts in their lab reports to "clarify that the source of the identified cannabinoid(s) cannot be established." *See* Exhibit G.

47.     Even the Forensic Division scientists who supported the policy knew that it was highly unlikely that *any* of the marijuana oils and edibles the various Forensic Division labs were analyzing were synthetic since it also knew that a sample containing THC plus two or three other cannabinoids was plant-based with a high degree of certainty.  *See* Exhibit H, March 15, 2014, email from Bowen to Hoskins.  The Forensic Division therefore also knew that its policy of requiring a crime lab report to state that oils and edibles contained Schedule 1 THC if no visible plant material was present was scientifically unsupported and would result in medical marijuana patients and other citizens potentially being charged with felonies they did not commit.

48.     The actions of the Forensic Division were the opposite of science.  Indeed, the official policy turned a blind eye to the truth.  A person, let alone a forensic scientist, cannot be "aware of a high probability that something is true" and "deliberately close (one's) eyes to what was obvious."  Sixth Circuit Pattern Jury Instruction 2.09.  Indeed, forensic scientists often must determine what is most likely or most probable in order to properly fulfill their duty to provide the most accurate information to both prosecutors and

persons who are or could be charged with a crime. Even a DNA test does not purport to establish with 100% accuracy the associated person. Other tests, such as hair and fiber tests, have an even greater degree of uncertainty, but results showing the most likely or percent chance of a match are routinely made by forensic scientists.

49.    In mandating the policy, the Forensic Division is declaring that in all cases where marijuana plant material is not visible, the origin of THC in a sample is scientifically unknown and unknowable and is as likely to be synthetic as plant-based. This is false as evidenced by, among other things, the lab results in Maxwell's case.   The gas chromatography test of the substance at issue showed other naturally occurring cannabinoids in the sample, thus establishing its plant origin with an extremely high degree of probability.

50.    The arbitrary nature of the policy is underscored by the Forensic Division policy to identify a sample as marihuana if there is visible plant material. If a scientist cannot "know" if numerous naturally occurring cannabinoids were synthesized and added to a sample, how can the scientist "know" plant material was not added to synthetic THC in a sample? The answer is a scientist must reach the most reasonable conclusion based on the actual evidence and test results.

51.    Further, although apparently not available to Forensic Division or County Lab scientists, a liquid chromatography test would in most cases conclusively determine whether THC is synthetic or natural. It is unknown why the Forensic Division and County Lab have not taken advantage of this test, particularly given the difference in treatment

between synthetic and natural THC under the MCSA, but one reason may be to ensure they can still falsely identify Schedule 1 THC in their reports.

52.     In addition, the Forensic Division can test for known synthetic cannabinoids. It purchases "reference standards" of synthetic marijuana, small purified samples of synthetic cannabinoids that it uses to determine if a substance is illegal, from Cayman Chemicals in Ann Arbor. "If we couldn't purchase standards, we wouldn't be able to make the (synthetic) identification," said State Police Crime Lab forensic scientist Kyle Ann Hoskins. "That is a necessity." Detroit Free Press, December 20, 2012.

53.     In issuing false lab reports, the Forensic Division in concert with PAAM violated the fundamental constitutional rights of Plaintiffs and other citizens. Maxwell was wrongfully charged with a felony offense, and was denied his right to defend himself with a scientifically sound analysis of the substance at issue.  Further, Maxwell, Erica, and their child's liberty interests were also violated since the child was taken by the State and placed for potential adoption, even though the child was eventually returned after Maxwell's criminal case was dismissed.  Each and every forensic lab report that was issued stating "THC Schedule 1 (origin unknown)" or "could be plant or synthetic source" was knowingly false and/or grossly inaccurate.

54.     The Forensic Division recently updated its policy regarding the reporting of THC found in oils and edibles to require its lab reports to state "the origin of Delta-1-Tetrahydrocannabinol may be from a plant (marijuana) or a synthetic source." *See* Exhibit I.  While changing the verbiage, the new Forensic Division policy does not address any of the concerns raised above regarding its prior mandated language.  Indeed, the new policy

still allows felony charges for the possession of what the Forensic Division's own test results show to almost certainly be marijuana, which is a misdemeanor and potentially no charge for a medical marijuana patient.

### G.   THE DEFENDANTS FAIL TO REPORT EXCULPATORY EVIDENCE AND TO PROVIDE TEST RESULTS ESTABLISHING THE EXCULPATORY EVIDENCE

55.     As noted above, the existence of other naturally occurring cannabinoids along with THC in a sample establishes with almost certainty that the sample is plant-based, and therefore marijuana.  Indeed, Maxwell successfully made that very argument in his criminal case.  However, despite testing for and identifying other cannabinoids in a sample, both the Forensic Division and County Lab fail to note in their reports that the presence of other naturally occurring cannabinoids was also detected in a sample.  Further, it appears that the Defendants only test a sample for a limited number of naturally occurring cannabinoids even though they have the capability to test a sample for many more naturally occurring cannabinoids.

56.     Information regarding the presence of naturally occurring cannabinoids in a sample is clearly exculpatory with respect to a potential charge of possession of synthetic THC, and therefore the Defendants have an obligation, given how they report their findings, to note such information in the reports issued to prosecutors and given to criminal defendants.

57.     Compounding this issue, neither Defendant provides actual test results to prosecutors, and therefore prosecutors do not turn over the test results to persons charged with a crime based on a lab report that identifies Schedule 1 THC.  Indeed, none of the

Plaintiffs were provided such information, but rather were informed that it could only be obtained from Defendants through a Freedom of Information Act request.  This practice is contrary to the Defendants' constitutional obligation to provide exculpatory evidence without request.

58.     Further, the failure to note the exculpatory evidence in the actual report, and the failure to test for additional naturally occurring cannabinoids, requires a criminal defendant to engage the services of an expert to interpret the test results generated by the Defendants.  For example, Maxwell was required to engage an expert since the test results could not be fully interpreted by a layman.  This practice also violates Defendants' obligation to provide exculpatory evidence to Plaintiffs.

### V.  <u>FACTS RELATING TO CLASS CERTIFICATION</u>

59.     The Court, pursuant to Fed. R. Civ. P. 23, should certify a class as follows:

> Every participant in the MMMP who uses marijuana edibles or oils, with a sub-class of MMMP participants who have been prosecuted or who have had property seized under Michigan law based in whole or in part on a lab report stating "Schedule 1 THC," but the source is unknown or source could be plant or synthetic.

60.     The class should be certified because (a) the affected parties are so numerous that joinder of all members is impracticable; (b) there are questions of fact and law common to both classes; (c) the claims of the Plaintiffs are typical of the claims of the proposed class which all arise from the same pattern or practice and are based on the same legal theories; and (d) the representative parties will fairly protect the interests of the class.

61.     There are approximately 180,000 active registered medical marijuana patients in Michigan, and approximately 33,000 registered medical marijuana caregivers

in Michigan. A large number of medical marijuana patients use marijuana oils and edibles in order to avoid having to smoke the marijuana. These individuals are likely to be in possession of marijuana oils and edibles at all times so that their medical condition can properly be treated. Accordingly, these medical marijuana patients and caregivers are all at risk from the Defendants' reporting practices described above.

62. The Defendants have also acted, or refused to act, on grounds that apply generally to the proposed class so that final declaratory relief and corresponding injunctive relief is appropriate with respect to the class as a whole. Further, separate actions by proposed class members would create a risk of inconsistent or varying adjudications that would establish an incompatible standard of conduct for the Defendants. Plaintiffs request that the proposed class be certified pursuant to Rule 23(b)(1)(A) and 23(b)(2).

## VI. CAUSE OF ACTION

### A. VIOLATION OF 42 U.S.C. §§ 1983 AND 1988

63. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

64. The Forensic Division and the County Lab are state actors and their actions in issuing the lab reports are state actions.

65. The Defendants violated the due process and Fourth Amendment rights of the Plaintiffs by systematically, knowingly, and falsely reporting the presence of Schedule 1 THC when samples are actually marijuana under the MCSA. A criminal prosecution based upon false evidence cannot comport with either procedural or substantive due process, and clearly violates the Fourth Amendment, as citizens have the right not to have criminal charges filed against them based on false information, and the right not to have

false evidence presented against them.  Plaintiffs and proposed class members are subject to such deprivations in the future since Defendants continue to apply their policy on reporting THC in oils and edibles.

66.     Plaintiffs and many class members were deprived of their liberty by being arrested, charged, and often jailed for periods of time based on the false lab reports issued by the Forensic Division and County Lab, and are subject to such deprivations in the future.

67.     All citizens have the clearly established constitutional right not to have criminal charges filed based on false evidence and to be deprived of liberty as a result of any government officer's fabrication of evidence.

68.     All citizens also have a constitutional right not to be coerced into guilty pleas based upon false allegations and false testimony.

69.     The Forensic Division's and County Lab's conduct in purposefully manufacturing felonies is such that it shocks the conscience thereby violating due process.

70.     As a direct and proximate result of the Defendants' policy, Plaintiffs and class members are at risk of being wrongfully charged with crimes and felonies they did not commit and unreasonable searches, detention, and incarceration.

## VII.  <u>PRAYER FOR RELIEF</u>

71.     WHEREFORE, Plaintiffs and other class members request that this Court issue the following relief:

      a.    The Court certify the class requested herein;

      b.    A declaratory judgment that the Defendants' policy of reporting that oils and edibles containing THC as "Schedule 1 THC," whether or not qualified by statement that it could be from synthetic or plant source,

when two or more naturally occurring cannabinoids other than THC are also found in the sample is improper and violates Plaintiffs' and class members' constitutional rights;

c. A declaratory judgment that Defendants failure to note in the reports analyzing oils and edibles that naturally occurring cannabinoids other than THC were found violates Plaintiffs' and other class members' constitutional rights;

d. An injunction enjoining Defendants from issuing reports in the future contrary to the declaratory relief granted by the Court;

e. Require Defendants to amend existing forensic reports in pending criminal cases to conform with the declaratory relief granted by the Court;

f. The appointment of a crime lab monitor to assure compliance with the injunctive relief granted;

g. An award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

h. For such other and further relief to which Plaintiffs and the class may show themselves justly entitled.

PLAINTIFFS REQUEST TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Respectfully submitted,


By: /s/ Michael A. Komorn
　　　Michael Komorn (P47970)
　　　michael@komornlaw.com

Law Office of Michael A. Komorn
30903 Northwestern Highway, Suite 240
Farmington Hills, MI 48334
248-321-8870 (Direct)
800-656-3557 (Toll Free)
248-357-2550 (Office)
855-456-6676 (Fax)

Timothy A. Daniels
Texas Bar No. 05375190
tim.daniels@figdav.com

24

**FIGARI + DAVENPORT, LLP**
901 Main Street, Suite 3400
Dallas, Texas  75202
Telephone: (214) 939-2000
Facsimile: (214) 939-2090

ATTORNEYS FOR PLAINTIFFS